AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California



| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Black Coolpad smartphone, Model Coolpad 3622A, IMEI<br>861325034461037 | )<br>)<br>)<br>)<br>)    Case No.<br>) |

**17MJ00495**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 371, 1028, 1028A, 1029, 1704, 1708, 1344, 1343 | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dagmawi Abebe, USPIS Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/7/17

*Patrick J. Walsh*
*Judge's signature*

City and state: Los Angeles, California

PATRICK J. WALSH
*Printed name and title*

AUSA: Victoria A. Degtyareva x17635  VAD

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device, recovered by the Los Angeles County Sheriff's Department on October 11, 2016, in West Hollywood, California, and currently maintained in the custody of the United States Postal Inspection Service in Los Angeles, California: a black Coolpad smartphone, Model Coolpad 3622A, IMEI 861325034461037.

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   Fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Fraud and Related Activity in Connection with Access Devices), 1704 (Unlawful Possession of Postal Keys and Locks), 1708 (Mail Theft and Possession of Stolen Mail), 1344 (Bank Fraud), and 1343 (Wire Fraud), namely:

a.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than NEGREROS or Heaton, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

c.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

ii

Instrumentality Protocol

   d.     Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

   e.     Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts of any individual who is not NEGREROS or Heaton;

   f.     Records, documents, programs, applications, or materials relating to United States mail or mail matter that is not addressed to NEGREROS or Heaton;

   g.     Contents of any calendar or date book stored on any of the digital devices;

   h.     Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

   i.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

   j.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   k.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written

Instrumentality Protocol

communications sent to or received from any of the digital devices and which relate to the above-named violations;

l.    Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or of postal arrow keys;

m.    Any device used to facilitate the above-listed violations (and forensic copies thereof).

2.   With respect to any digital device used to facilitate the above-listed violations containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    Evidence of the attachment of other devices;

d.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    Evidence of the times the device was used;

Instrumentality Protocol

f.    Passwords, encryption keys, and other access devices that may be necessary to access the device;

g.    Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.    Records of or information about Internet Protocol addresses used by the device; and

i.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

VIII.    **SEARCH PROCEDURE FOR DIGITAL DEVICES**

3.    In searching the device listed in Attachment A (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any device capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each device where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

v

Instrumentality Protocol

c.    The search team shall complete the search of the devices as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.   The government will not search the digital devices beyond this 120-day period without first obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of the items to be seized.   The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.    If the search team, while searching a device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team

vi

Instrumentality Protocol

shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      f.    If the search determines that a device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      g.    If the search determines that a device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      h.    If the search determines that the device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

      i.    The government may retain a device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an

Instrumentality Protocol

order is pending).  Otherwise, the government must return the device.

       j.   After the completion of the search of the devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Instrumentality Protocol

## AFFIDAVIT

I, Dagmawi Abebe, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against AURA NEGREROS ("NEGREROS") for a violation of Title 18, United States Code, Section 1708 (Mail Theft).

2.    This affidavit is also made in support of an application for a warrant to search a black Coolpad smartphone, Model Coolpad 3622A, IMEI 861325034461037 (the "HEATON PHONE"), which was recovered by the Los Angeles County Sheriff's Department ("LASD") on October 11, 2016, in West Hollywood, California, and is currently in the custody of the United States Postal Inspection Service ("USPIS"), as described more fully in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Fraud and Related Activity in Connection with Access Devices), 1704 (Unlawful Possession of Postal Keys and Locks), 1708 (Mail Theft and Possession of Stolen Mail), 1344 (Bank Fraud), and 1343 (Wire Fraud), as described more fully in Attachment B.  Both Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

1

Instrumentality Protocol

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF POSTAL INSPECTOR DAGMAWI ABEBE

4. I am a United States Postal Inspector employed by the Los Angeles Division of the United States Postal Inspection Service ("USPIS"). I am currently assigned to a Mail Theft Team. I have been employed as a Postal Inspector since June 2012. In this capacity, my responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, possession of stolen United States mail, access device fraud, and identity theft.

5. I completed a twelve-week basic inspector training course in Potomac, Maryland. That course included training in the investigation of mail theft, identity theft, mail fraud, internet crimes, threats, assaults, robberies, burglaries and prohibited mailings such as: narcotics and child pornography. In addition, I have received other formal and informal training from the Inspection Service and outside agencies including: identity theft investigations training offered by the San Francisco District Attorney's Office, cell phone investigations

2

Instrumentality Protocol

training offered by the California Narcotics Officers Association as well as cell phone forensics training, and field legal update training offered by USPIS.

6. During my employment as a Postal Inspector, I have participated in the investigation of mail theft, identity theft, access device fraud, bank fraud, and related crimes. During the course of my investigations, I have worked with local, state and federal law enforcement officers, forensics analysts, bank investigators and loss prevention officers.

7. I also investigate crimes related to the use, theft, or counterfeiting of USPS "arrow keys" and locks. From my training and experience, I know that USPS arrow keys are keys used by USPS mail carriers to unlock USPS arrow locks, in order to gain access to neighborhood delivery collection box units, housing complexes or apartment buildings and deliver mail to the respective mailboxes found inside — most commonly found in a mailbox panel. Postal arrow keys are also sometimes used to gain access to mail collection boxes in a specific area. A postal arrow key is not for use by, or available to, the general public.

### III. SUMMARY OF PROBABLE CAUSE

8. A surveillance video taken from an apartment building at 8871 Burton Way, West Hollywood, California 90048, on or about October 11, 2016, showed a man and a woman entering the apartment building. The woman took mail from the building's outgoing mail depository. The man used what appears to be a postal arrow key to open the building's mailbox panels, and took

3

mail from the panels.  The man then put the stolen mail into a duffle bag that he brought into the building.

9.     Later that day, a security guard found a duffle bag that looked like the bag shown on the surveillance video approximately one mile away from 8871 Burton Way.  Inside the duffle bag, LASD deputies found a cellphone (the "HEATON PHONE") and numerous pieces of mail, including mail from 8871 Burton Way and other addresses in the area.

10.    A resident of 8871 Burton Way said he had placed checks into the building's outgoing mail depository on the day before the mail theft.  One of the checks had been fraudulently cashed, and the "pay to" line on the check had been altered to read "Aura Negreros."  The words "CAPITAL ONE, NA" and a bank account number ending in 9429 were stamped on the back of the check.  A photograph of AURA NEGREROS from California Department of Justice ("CALDOJ") records resembled the woman shown stealing mail on the surveillance video.  Records from Capital One Bank showed that the account number ending in 9429 was in NEGREROS's name, and that the check from A.N.'s account was deposited into NEGREROS's account on October 12, 2016.

## IV. STATEMENT OF PROBABLE CAUSE

### A.    Mail Theft on October 11, 2016

11.    On or about October 21, 2016, I interviewed M.R., a resident of an apartment building at 8871 Burton Way, West Hollywood, California 90048.  M.R. told me he had surveillance video showing a man and woman stealing mail from the mailbox panels in the apartment building.

Instrumentality Protocol

12.   I watched the surveillance video M.R. told me about.
The video showed the following: shortly before midnight on
October 10, 2016,[1] a man and woman approached the main entrance
of the apartment building.   The man appeared to use a key or
some other tool to open a postal lock that was installed on the
apartment building's intercom system near the doorway.   While
the man was using the key or other tool, the woman pulled on the
front door of the building several times until it opened.   Both
the man and the woman then entered the lobby of the building.
The man was carrying a dark blue duffle bag with black straps.
The woman took mail out of the building's outgoing mail
depository.   The man opened the mailbox panels inside the lobby
using what appeared to be a postal arrow key and took out some
mail.   While the man was taking mail from the mailbox panels,
the woman stood by the glass front door of the building looking
out into the street.   The man then placed the mail from the
outgoing mail depository and from the mailbox panels into the
duffle bag, and both individuals left the building.

13.   M.R. told me he had never seen either of the
individuals shown on the video before and that, as far as he
knew, they were not residents of the apartment building.   M.R.
said that two other residents of the building, P.S. and A.N.,
told him that their checks had been stolen.   M.R. also told me
that, after the theft, the Los Angeles Sheriff's Department

---

[1] The man and woman remained inside the apartment building
until past midnight into the early morning hours of October 11,
2016.

Instrumentality Protocol

("LASD") contacted residents of the apartment building about a duffle bag that was found containing mail belonging to those residents.

B.   **Interview of Mail Theft Victim**

14.   On or about October 21, 2016, I interviewed A.N. who told me he deposited four checks into the outgoing mail depository of the apartment building on or about October 10, 2016.   A.N. said he later learned that one of the checks, which was intended to pay his property tax, had been fraudulently cashed and that the "pay to" and "memo" fields on the check had been altered.

15.   On or about October 24, 2016, I received a copy of the fraudulent check from A.N.   The check was in the amount of $1,869.97, dated October 10, 2016, had A.N.'s name and address on the top, and was made payable to "AURA NEGREROS."   The back of the check was stamped with the words "CAPITAL ONE, NA" and a bank account number ending in 9429 (the "9429 account").

C.   **Review of Bank Records**

16.   I reviewed CALDOJ records and located a booking photograph for AURA NEGREROS, whose date of birth was in July 1984.   The photograph of NEGREROS resembled the woman shown stealing mail on the surveillance video from 8871 Burton Way, West Hollywood, California.

17.   I reviewed an investigative report from Capital One Bank regarding the fraudulent check that had been cashed from A.N.'s account.   From my review of the report, I learned the following:

6

Instrumentality Protocol

a.    The 9429 account was associated with an individual named "Aura Negreros," whose date of birth was in July 1984, social security number ended in 7082, and address was on North Hobart Boulevard in Los Angeles, California.

b.    A check in the amount of $1,869.97 was deposited into the 9429 account on October 12, 2016, the day after mail was stolen from A.N.'s apartment building.  The check was deposited using remote deposited capture ("RDC"), which means that the check was deposited remotely using an application on a cell phone or tablet.

c.    The image of the check that had been deposited into the 9429 account was identical to the copy of the fraudulent check I received from A.N.

18.    I used the CLEAR[2] database to research the name and address associated with the 9429 account.  The CLEAR search found that NEGREROS had the same date of birth, social security number, and address as those associated with the 9429 account.

D.   Search of Duffle Bag

19.    I reviewed an LASD report regarding the duffle bag that was found on October 11, 2016, containing mail belonging to residents of 8871 Burton Way.  From my review of the report, I learned that, on or about October 11, 2016, a security guard found a duffle bag at a bus stop next to 8687 Melrose Avenue in West Hollywood, California, which is approximately one mile away

---

[2] CLEAR is a public information database used by law enforcement that provides names, addresses, telephone numbers, and other identifying information.

7

from 8871 Burton Way.  The security guard left the duffle bag at
LASD's West Hollywood station.  Inside the duffle bag, LASD
Deputy Maldonado found a cellphone (the "HEATON PHONE");
numerous pieces of mail, including mail from 8871 Burton Way and
other addresses in the area; and a blank checkbook belonging to
an account associated with one of the addresses from the mail.

20.  The duffle bag was the same in color, size, shape, and
overall appearance as the duffle bag into which the suspected
mail thieves placed stolen mail on the surveillance video from
8871 Burton Way.

21.  I spoke to LASD Detective John Hatfield, who told me
that the mail found in the duffel bag had been delivered to its
intended recipients.  He also told me that, when he looked
through the cell phone found in the bag, he found a name and
email address for "Aiden Worth."  Detective Hatfield said he
attempted to contact that person intending to return the
property, but was unsuccessful.

22.  I reviewed CALDOJ records and located a booking
photograph for Worth, whose date of birth was in February 1985.
Based on a review of law enforcement databases, I learned that
"Aiden Worth" was an alias for Herbert Ray Heaton III
("Heaton"), whose date of birth was in February 1985.  I
reviewed Heaton's photograph from California Department of Motor
Vehicles records.  The photograph of Heaton resembled the man
shown stealing mail on the surveillance video from 8871 Burton
Way.

Instrumentality Protocol

## V.   TRAINING AND EXPERIENCE REGARDING MAIL THEFT INVESTIGATIONS

23.   Based on my training and experience, including being a member of a USPIS Mail Theft Team, and information obtained from other law enforcement officers who investigate bank fraud and mail and identity theft, I know the following:

a.   Persons involved in mail theft and identity fraud typically obtain the checks and personal information they seek by stealing the mail of victims, or from co-conspirators who have done these things.

b.   Persons who steal mail are often involved in identity theft crimes.  These individuals usually steal mail looking for access devices and other personal identifying information that they can use to fraudulently obtain money and items of value.  It is common practice for individuals involved in mail theft, access device fraud, and identity theft to use and maintain digital devices.  These digital devices include, but are not limited to, thumb drives, memory chips, flash drives, computers, tablets, and cellphones.  These individuals use such devices to store information about their identity theft crimes during and long after the crimes have been committed. This information can include, but is not limited to, the following: logs of fraudulent transaction history; records of funds received; information regarding individuals and companies that have been victimized; records of payments from co-conspirators; and victim profiles.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or

9

Instrumentality Protocol

state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

       c.    Mail and identity thieves oftentimes use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically on the internet.  These individuals employ digital devices for purposes of, among other things, (i) applying online for fraudulent credit cards, (ii) obtaining personal identification information for the purposes of establishing or modifying fraudulent credit card accounts, (iii) using fraudulently obtained credit cards to make purchases, (iv) manufacturing counterfeit identification, credit cards, and checks, and (v) keeping records of their crimes.

       d.    Individuals who participate in these schemes often maintain telephone numbers and other contact information of their co-conspirators in their digital devices in order to facilitate their crimes together.

       e.    Based on my training and experience, I know that individuals who participate in these schemes often work with co-conspirators to collect and use personal identifying and account information of their victims.  These individuals often communicate by phone, e-mail, text message, and social media, sometimes exchanging information and photographs related to their crimes.

Instrumentality Protocol

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. It is difficult to estimate the precise storage space contained on the device listed in Attachment A before conducting a preliminary examination of the device, but, based

11

Instrumentality Protocol

on my training and experience, I know that cellular telephones can contain multiple gigabytes of storage space. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

        d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more

12

recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and user habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

      e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal

Instrumentality Protocol

information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the digital device was in use.  Digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

        g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including

14

Instrumentality Protocol

the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.

　　　　h.　　Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

//

//

//

//

//

//

15

Instrumentality Protocol

## VII. CONCLUSION

25. Based on the foregoing, there is probable cause to believe AURA NEGREROS violated Title 18, United States Code, Section 1708 (Mail Theft).

26. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found on the digital device described in Attachment A.

/S

DAGMAWI ABEBE
Postal Inspector
United States Postal Inspection
Service

Subscribed to and sworn before me
this 7th day of March 2017.

HONORABLE PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

16

Instrumentality Protocol